## Case No. 11,801.

RICHMOND v. RICHMOND et al.

[4 Chi. Leg. News, 41.]

Circuit Court, N. D. Illinois. Aug. 2, 1871.

MORTGAGE — ABSOLUTE DEED CONSIDERED AS — PARTNERSHIP.

When an absolute deed may be considered a *mortgage*, and under what circumstances such deed may become absolute as it appears on its face.

In equity.

Knowlton & Jameson, for complainant.

Waite & Clarke and C. Beckwith, for defendant Mary E. Richmond.

BLODGETT, District Judge. The complainant in this case, Holland M. Richmond, files his bill, in the nature of a bill to redeem, against Mary E. Richmond, as executrix and legatee of Dean Richmond, deceased, and Thomas Richmond, who was formerly a partner of the complainant, Holland M. Richmond. The complainant alleges that a copartnership formerly existed in this city between Thomas Richmond and one or more of his sons, at different times, but the business being at all times transacted under the firm name of Richmond & Co., and that during the transactions referred to, and in regard to which relief is sought in this bill, the firm was composed of the complainant, Holland M. Richmond, and his father, Thomas Richmond, making the firm of Richmond & Co. The substantial allegations in the bill are that in 1856 the firm of Richmond & Co. became indebted to Dean Richmond, then of Batavia, N. Y., in a considerable sum of money, and also sought from Dean Richmond a loan of money for the purpose of completing a hotel then in process of erection in this city, known as the "Richmond House," and that such negotiations were had between the parties, which it is not necessary to detail here at length, as resulted in the execution of two mortgages by Allen Richmond and wife,—who at that time seems to have been a member of the firm of Richmond & Co., or at least to have held in his name a title to a part of the real estate,—one of said mortgages being for the sum of $30,000, to secure the bond of Richmond & Co., payable with seven per cent. interest, and the other of said mortgages being for the sum of $30,000, to secure the payment of the bonds of Richmond & Co., with ten per cent. interest. Both of these mortgages bear date on the first day of January, 1856, but they are acknowledged on the fifth day of April, 1856, and recorded shortly afterwards, there seeming to have been some hitch in the negotiations, which delayed their delivery for some time after they were prepared. The mortgages thus given are attacked in this bill as having been given partially to secure an indebtedness of W. T. Richmond to Dean Richmond, which it is alleged has been canceled since that time in two ways: First, that W. T. Richmond has taken the benefit of the insolvent laws of the state of New York, and thereby released himself from liability; and, secondly, that by subsequent dealings between Dean Richmond and W. T. Richmond this indebtedness was extinguished by a large amount of money received by Dean, which ought to have been passed to the credit of W. T. Richmond, being the earnings of certain boats, and the proceeds of the sale of certain boats, which W. T. Richmond and Dean Richmond managed together. It is also alleged in the bill that after the giving of these mortgages, some time about the 9th of December, 1858, the said mortgages given by said Allen Richmond were released, and Holland M. Richmond, the present complainant, conveyed to Dean Richmond, by a deed absolute upon its face, the property described in these deeds, also certain other property in addition, and that the giving of these deeds was merely a security for the indebtedness previously secured by said mortgages, and

that these deeds now stand as a security for that indebtedness; that contemporaneously, or at or near the time of the giving of these deeds by Holland M. Richmond and Allen Richmond, the firm of Richmond & Co. also turned out to Dean Richmond, and placed in his hands, also, as they allege, as security, certain stocks and bonds, and notes secured by trust deeds and mortgages, of great value, and also a lot in the city of Racine. The bill then goes on to aver that the parties treated these transactions always, from the time the deeds were given, as a mortgage; that Dean Richmond, however, after the lapse of some time, in violation of his trust relationship, proceeded to sell some part of the property in question, and that he also, in violation of his trust, allowed the Richmond House, which had previously been mortgaged to one George Brown for $60,000, to be sold upon the prior mortgages, when he had agreed to protect the property against those mortgages by the payment of the interest and principal as it matured, and that thereby the complainants, or the firm of Richmond & Co., were subjected to great loss, to wit, the difference between the value of the Richmond House property and the mortgages upon which it was sold. They also aver that Dean Richmond sold three lots fronting on Michigan avenue, directly north of the Richmond House, for a grossly inadequate price, and claimed to recover the difference between that price and the actual value of the property. A similar claim is made in reference to a certain piece of property which is known as the "Park Row Property," being the house occupied by Thomas Richmond at the time this conveyance was made, and which he continued to occupy for two or three years afterwards. Dean Richmond sold this house some time in the year 1862 for $10,000. It is claimed that it was then worth $20,000, and is now worth a great deal more. It is claimed that the Richmond House was sold upon its mortgages, and suffered to be sold for about $50,000, when it was worth $200,000, and that difference is claimed to be accounted for by the estate. The Michigan avenue lots, north of the Richmond House, it is claimed, were sold for some ten or twelve thousand dollars less than their actual value. It is also alleged that the deceased, Dean Richmond, during his lifetime, made certain gifts or conveyances of some portion of the property which was conveyed to him, situated southwest of the city, known in the papers here as the "Country Farm," described in the pleadings and proofs as the "Farm," to the Chicago, Burlington & Quincy Railroad, in such manner as to make him accountable for the present value of the property, and a similar charge is made with reference to some of the property situated on Milwaukee avenue, or the junction of Milwaukee avenue and Chicago avenue, and near there. It is also alleged that Dean Richmond, in violation of his trust, disposed of, and converted to his own use, several thousand dollars of the stock of the Chicago, St. Paul & Fond du Lac Railroad Company, and some $10,000 or $12,000 of the stock of the Chicago & Milwaukee Railroad Company, $4,000 or $5,000 of the bonds of the city of Racine, and a certain mortgage which was given by the Racine Railroad Company, for about $6,000, on certain property situated in Racine, upon which the depot grounds, I think, of the Racine & Mississippi Railroad, were located. It is also alleged that some time in the year 1859, at the request of the firm of Richmond & Co., or of Thomas Richmond, Dean Richmond bought two hundred shares of Chicago & Rock Island Railroad stock, and two hundred shares of the stock of the Chicago & Galena Union Railroad Company, at prices varying from sixty-five to seventy-two cents on a dollar; that those shares were sold at a small advance, of about 5 cents on a dollar, when they should have been kept until some time in 1864,—in May or June in 1864,—when the stock of the Chicago & Galena Railroad Company was worth one hundred and fifty or one hundred and sixty cents on a dollar, and the stock of the Rock Island road has since been worth over one hundred and thirty cents on a dollar. The margin or difference between the cost of these stocks and the interest on that cost, and the prices at which they would have sold, is claimed as against Dean Richmond. It is also alleged that the indebtedness for which these deeds were given has been largely reduced by these sales, and that by a fair accounting between the parties the complainant, or the firm of Richmond & Co., are entitled to have returned to them the unsold portions of the property, which was conveyed by these deeds of the 9th of December, 1858, and the larger balance which would be due for the value of the property thus improvidently sold, including the stock and securities.

This forms the substantial claims for the interposition of this court, upon which the complainant bases his bill. He alleges that Thomas Richmond refuses to join with him in bringing this bill, and therefore makes him a defendant. I have carefully examined the proof in this case, which is very voluminous, and has been taken very much in detail by both parties, and without going elaborately into an examination and canvass, in this opinion, of all the testimony, I will simply say that it seems to me the evidence, by a clear preponderance, justifies the conclusion that the transaction of the 9th of December, 1858, when the absolute deeds of this property were given to Dean Richmond by Holland M. and Allen Richmond, was in the nature of a security for the then existing and future indebtedness between the firm of Richmond & Co. and Dean Richmond; and I am clearly of opinion that had a bill been filed by the firm of Richmond & Co., or Holland M. Richmond, within any reasonable

time after the giving of those two deeds, and while the dealings of the parties continued substantially in the same manner as they seem to have continued immediately after these deeds were given, a court of equity would have treated those deeds as equitable mortgages, and decreed that the property be reconveyed upon the payments of the indebtedness then existing between them.

My reasons for coming to these conclusions are substantially these: There is a document produced in evidence, which, from the best data that I have been able to obtain with reference to the time when it was made up, I think was actually made about the date of the deeds, which purports to be a memorandum of the securities held by Dean Richmond. It does not state what it is security for, but it states that it is a memorandum of securities held by Dean Richmond, and that document is so connected with Dean Richmond by the proof as, in my opinion, to charge him as admitting or conceding its contents, and there can be no other transaction between the parties, to refer this document to, except the transaction of these deeds; and I therefore conclude, the parties at that time looked upon this property as held by Dean Richmond to secure an indebtedness between himself and the firm of Richmond & Co. There is also another significant fact connected with the manner in which the parties kept their accounts. At about the time these deeds were given, the firm of Richmond & Co. were indebted to Dean Richmond in a balance of about $106,-000—including these two mortgages of $30,000 each—and the accrued interest thereon; the amount over and above the mortgages being for balances of account, money advanced and paid, and indebtedness assumed by Dean Richmond for Richmond & Co. after the execution of these mortgages. It must be borne in mind that these deeds bear date on the 9th of December, 1858, and on the 1st of January, 1859, only a few days after the date of these deeds, Dean Richmond charges up, in account against the firm of Richmond & Co., these two mortgages. They seem no longer to have been kept among the bills receivable of Dean Richmond; they seem no longer to have been treated by him as a part of the paper which he expected to be paid at maturity,—current commercial paper; but they were charged up in account, and the notes or mortgages filed by his bookkeeper as vouchers to sustain his account; and from that time forward the interest, whenever interest was computed upon this mortgage indebtedness, is computed at 7 per cent. per annum, instead of being computed at 10 per cent., upon one of the $30,000 mortgages, as it would have been upon its face. This is a circumstance which of itself, perhaps, standing alone, would not be of sufficient weight, but, taken in connection with all the transactions between the parties, I think, tends to sustain the theory on the part

of the complainant, that these deeds were mortgages. Then, whenever called upon, and perhaps once, if not more, voluntarily, after the 1st of January, 1859, Dean Richmond renders a statement of account to Richmond & Co., showing that the relation of debtor and creditor still existed, and was treated as existing, between the parties.

There is nothing disclosed in the evidence as to the direct and express communication between the parties, as to terms upon which these deeds were made. There is evidence in the case going to show that one Beers, and certain other creditors of the firm of Richmond & Co., were pressing the firm of Richmond & Co. here for an indebtedness which they were unable to pay, and were about to commence suit for the collection of their indebtedness, and finally Beers & Co. did commence, and at about that time, or about the time that Beers filed his bill, Richmond & Co. called upon Dean Richmond for statements of account, saying in substance that Beers had filed his bill, in which he proposed to uncover everything and bring all truths to light, and asked Dean Richmond to furnish statements of account, for the purpose of making up their answer, and one at least of these statements was undoubtedly furnished for the purpose of putting in an answer in the case. It does not clearly appear whether Dean Richmond was made a party to that bill, or not, by anything which attracted my notice in looking through the papers, but the firm of Richmond & Co. sought from Dean Richmond this statement of account for the purpose of facilitating the making of their answer, and sustaining the conveyances which they had made. Then, too, as bearing upon the question, we have a characteristic letter from Dean Richmond, bearing date on the 21st of October, 1857, in which he says: "Your favor is received. Will write you soon. If you think there is difficulty, you had better allow all the property to me. That will let your creditors see that everything is in my hands." This letter is dated over a year before these absolute deeds were made, but, within about a month of the time of the making of these deeds, Allen Richmond makes another mortgage to Dean Richmond of all the lands which are in controversy here,—I think the description covers them all,—to secure any balances which may be due from the firm of Richmond & Co., or Holland M. Richmond, to Dean Richmond, to the amount of $60,000. This mortgage was made a short time prior to the suggestion made by this letter of October, and may have been made, after all, in furtherance of the similar suggestion made by parol, but, as I said before, the evidence discloses no express understanding between the parties as to what was the intent of these deeds of the 9th of December, 1858, and the court is compelled to look into the circumstances and the facts and the relations existing between the parties, and determine from

these relations what the real intention was; and, determining from the light of those circumstances, I have come to the conclusion, as I said before, that the relationship of debtor and creditor did continue to exist between the parties after the execution of those deeds, and that they treated and considered it so; but the indebtedness did not grow any less, the interest accumulated, and the firm of Richmond & Co. seemed to have made no headway in the payment of any part of the principal, and on the 28th of February, 1861, Dean Richmond appointed Alonzo Richmond his agent to take charge of all his property in Chicago. The letter to Alonzo Richmond upon that subject is somewhat significant, and is as follows: "Buffalo, Feb. 28, 1861. Alonzo Richmond, Esq., Chicago—Dear Sir: I hereby appoint you my agent to take charge of all my property in Chicago. I own the lot and house that Thomas Richmond lives in. I own two houses below the Richmond House: there is one house between the Richmond House, and these two lots. I own a lot called the 'Napier Lot,' which you can find by calling upon Richmond & Co. I own a large lot on the West Side, making some forty lots. I have rent due me from the Richmond House; you will call upon Geo. Smith & Co., where you will find the lease. I have a farm of one hundred and fifty acres. I wish you to take charge of all this property; get whatever rents or income you can out of it. If any opportunity comes to sell, let me know, as I am desirous to sell; would be willing to give any time that is wanted on any of this property if enough is paid to make it secure, or if enough is expended on the property to make the sale good. I do not want any of the vacant stores in the Richmond House rented beyond July 1st, as I may give it up at that time. I have a lot in Racine. Mr. Murphy, N. Y. C. R. R. agent, will inform you in relation to it. Mr. Murphy would be a good man to sell it. You will show this to Richmond & Co., and take full charge of all the property mentioned. If Geo. Smith & Co. have not got the lease of the Richmond House, Messrs. Waite & Towne, my lawyers, have got it, and call upon them for it, they are getting other securities for me. I want the rent of the Richmond House paid promptly. Please let me hear from you as soon as convenient, after you have looked this matter over. Yours, truly, Dean Richmond."

I ought to have observed, in passing, that up to the writing of this letter the management and control of the property conveyed by these two deeds continued in the hands of Richmond & Co., and the title papers remained seemingly with them. They paid the taxes, collected the rents, made the repairs upon the property which needed repairing, and had general oversight and charge of it, which is another circumstance bearing strongly in favor of the hypothesis that these deeds were intended as mortgages. Alonzo Rich-

mond waited upon the firm of Richmond & Co. and upon Thomas Richmond with this letter, and they delivered over to him all the papers and muniments of title, and facilitated him in taking possession and control of the affairs of Dean Richmond, so far as this property is concerned, and from that time forward the firm of Richmond & Co., or either member of it, does not seem to have taken any active part in the management of this property; although, from the date of this letter up to September, there is no evidence of any express communication between the parties as to the relations which continued to be borne between them with reference to the property. The record does not disclose any negotiation, or any attempt at payment, nor does it disclose any dissent on the part of Richmond & Co. to the proceedings of Dean Richmond. But Dean Richmond did not sell the property, or seek to sell it; that is, he made no actual sale, although in his letter of the 28th he authorized his agent, Alonzo Richmond, to sell the property if he could find a purchaser, and indicated his wish and determination to sell it, and there is no dissent from the course on the part of Richmond & Co. They acquiesced in the course which Dean Richmond had indicated that he intended to pursue, and in the direction which he gave Alonzo Richmond, his agent, but there is no express assent. On the 21st of September, 1861, this letter is written: "Chicago, Sept. 21, 1861. Dean Richmond—Dear Sir: It seems to me that you had better credit up in detail or in gross, the ppty. you hold and balance our account in full of all in toto. I think it is certain that we shall never be able to do more than to give you what you have got, and it is now all in your possession, better figure it up to just what will settle the accounts all told, and balance the books. There are some things you never valued anything then or very little, such as the R. R. stocks and perhaps Racine city bonds and the like, worth little or nothing,—perhaps you would like to give back to help us figure out with. But do as you please as to keeping all or returning some—only balance the claims all told against any and all of us forming Richmond & Co. If there is any less sum than $10,000 you would take cash in hand for the furniture in the Richmond House, just make the figure— the very lowest cent cash. I am trying to induce Dickey to furnish me with means to buy the furniture—there may be a little prospect—the less the sum the better, or more likely to succeed. I offer him some motives to buy and hold the furniture for security of the cost till paid. Let me hear soon. Yours, truly, Tho. Richmond." The record does not disclose any express or categorical answer to this proposition. It will be borne in mind, however, and the court is bound to take notice of some facts of current history, that this letter was written about the darkest times, financially, in the history of this coun-

try,—during the time of the late Civil War. It was after it had become a fixed fact that we were to have a long, expensive, and bloody war with the revolted states. The financial affairs and policy of the country had not then taken any shape. The banks of this state had all failed. The currency of the state had all collapsed, and was then being retired and adjusted at the auditor's office at rates of from 30 to 50 cents a dollar; property, especially real estate, was greatly decreased in value, and business men no doubt as much discouraged as they ever have been at any period in the history of the country. At that juncture, Mr. Thomas Richmond, in behalf of himself and his partners, writes this letter. As I said before, there is no express answer to it. We have no letter from Dean Richmond to Thomas Richmond or Richmond & Co. in regard to these propositions. We have no evidence of any interview or communication between the parties in regard to the subject-matter of this letter, any further than what may be inferred from their conduct. There can be no doubt, I think, that the acceptance of the propositions contained in this letter would completely bar and defeat any claim which might have been set up previously by the firm of Richmond & Co., that these conveyances were in the nature of securities. It is a distinct and unequivocal proposition that Dean Richmond shall take what he then had, and balance his claims against the firm of Richmond & Co. If he assented to that proposition, so as to become bound by it, there can be no doubt, it seems to me, that it would defeat the claim that these deeds continued longer to operate as a mortgage.

The old and oft-quoted legal maxim, "Once a mortgage, always a mortgage," is, undoubtedly, to be read and considered with this limitation, "Once a mortgage, always a mortgage, until the parties to it agree to treat it differently." But when they agree to treat it differently, and do so treat it, it loses its character as a mortgage; one party ceasing so to treat it is not sufficient, but both parties so ceasing to treat it is sufficient, no doubt. Our supreme court, in a case reported in the 29th of Illinois, recognize this principle, and hold distinctly that the parties may abandon the equitable relation that exists between them, and that a conveyance absolute upon its face, although at one time in its history a mortgage, may subsequently become an absolute and indefeasible estate. The only question is, did the parties consent, or did Dean Richmond consent, to this proposition? And upon this question of fact I have carefully read the voluminous testimony which has been adduced by the parties, and have come to the conclusion that the evidence fully sustains the claim upon the part of the defendant that the parties did, from the date of this letter, treat this proposition as accepted. These conclusions are deduced mainly from the course of dealing between the parties, rather than from any express statement or words, either by personal intercourse or correspondence which transpired between them. In the first place the evidence disclosed the fact that Dean Richmond was here in the city of Chicago shortly after the writing of this letter. He was here and served with process in the case of Brown v. Richmond & Co. [unreported] for the foreclosure of the mortgage on the Richmond House. He was here again some time between the first of December and the first of January of that year, as shown by the testimony. There was, therefore, opportunity for personal interview between the parties. The evidence in the case discloses the fact that Mr. Dean Richmond was a man of very few words—his letters are brief and generally very much to the point. He was, evidently, as shown by the letters written by him and produced in evidence, a man of very little education. He might have had a personal interview, as I said before, with the firm of Richmond & Co., here in Chicago. He, no doubt, did not understand the necessity for any writing between himself and the firm of Richmond & Co., in order to vacate or avoid the construing of these deeds into an equitable mortgage. He had the deeds; they were safe in his custody, and purported on their face to convey to him an absolute estate in the property. He, no doubt, did [not] appreciate that he was under any other than an honorable obligation, as a business man, to reconvey the property on the payment of this indebtedness, and, when the firm of Richmond & Co. expressed their abandonment of any hope or expectation of paying this indebtedness, he considered the relationship of mortgagor and mortgagee at an end. This would be the conclusion of any person not learned in the law, who had not given to the subject any express consideration. He at once set his agent, Alonzo Richmond, to making sale of the property, and early the next spring he insisted upon having possession of the house which had been occupied by Thomas Richmond, in order that he might dispose of it. Mr. Thomas Richmond had built the house apparently for his own residence, and was reluctant to move out, and sought to rent it for a further term, at an increase of rent. But finally, on finding that he could not pay the amount of rent which Alonzo Richmond thought he could get from some other person for the property, he suggested the propriety of buying the house, and negotiations were set on foot between Thomas Richmond and Holland M. Richmond and Dean Richmond, through Alonzo Richmond here, Dean Richmond's agent, for the purchase of the Park Row house by Thomas Richmond or Holland M. Richmond. The price and terms were finally agreed upon, and the negotiations went so far as that Alonzo Richmond, Dean Richmond's agent here, made out a deed and forwarded it to Buffalo,

for Dean Richmond to execute. It was executed, and returned here to Alonzo Richmond, and on being tendered or offered to Thomas Richmond, and he being notified· that Alonzo was now ready to complete the trade, Thomas Richmond made reply that he had concluded not to take it; that he was too old to increase his liabilities. Now, if this property was held by Dean Richmond solely at that time, and ·so considered by the parties, as security for the indebtedness of Richmond & Co. to Dean Richmond, then, if Thomas Richmond bought back from Dean Richmond any part of the property, the purchase money, instead of increasing, went to diminish, his liabilities, and yet he refuses to consummate this contract for the purchase of this property solely on the ground that he was too old to increase his liabilities. Subsequently, Mr. Alonzo Richmond, as the agent of Dean Richmond, sold the house to another person, with the knowledge of Thomas and Holland M. Richmond. Thomas Richmond moved out and gave possession to the purchaser, and took out with him from the house the gas fixtures and the furnace, or, rather, they compromised in regard to the furnace and left it in, but received pay for it, treating the furnace as his, all which he would hardly have done if they considered that they owned the property, or had a reversionary right in it upon the payment of the indebtedness between themselves and Dean Richmond. Some time near the date of this letter of the 21st of September, 1861, Dean Richmond also quitclaimed back to Thomas Richmond the Richmond House property. The deed is not introduced in evidence, but the evidence in the case fully discloses the fact that such a deed was made and delivered to Thomas Richmond; that he attempted to negotiate with Judge Dickey, who was the agent of the Browns, upon the basis that he had received a deed from Dean Richmond of the Richmond House property, and was then the owner of it; and that he was in a position to treat with Dickey for the settlement of the mortgages which Dickey held as the agent of the Browns. The record does not disclose what the consideration was for this deed. We are left to conjecture entirely in regard to it. The deed itself must, from the nature of the case, have been in the possession of Mr. Thomas Richmond, and he has not produced it upon the trial. so that we do not know what the consideration expressed upon its face was. Dean Richmond is dead. His lips are sealed as to the reasons which moved him to make this deed. It may have been the very fact that Dean Richmond and Thomas Richmond, at some interview between them, concluded that Dean should keep the rest of the property, and Thomas, for Richmond & Co., take a deed of the Richmond property, and make the best that he could out of a compromise with Brown, and the balance ·of the property should go to Dean in settlement and adjustment of this indebtedness.

We do not know from the proofs why this deed was given. We can only conjecture in regard to it. But the fact is established that in his negotiations with Judge Dickey, and the attempt to procrastinate the foreclosure of these mortgages on the Richmond House, and attempt to set up a title to defeat the foreclosure, Thomas Richmond asserted that he had a deed, and exhibited it to Judge Dickey; so that the fact that dealings between Dean and Thomas Richmond, or Richmond & Co., took place at about this time, is established; enough is disclosed to show that this property, which is now alleged to be of such inestimable value that it forms the subject-matter of one of the gravest charges in this bill of complaint, was actually conveyed long before this sacrifice by Dean Richmond, back to Thomas Richmond, for some consideration or other. Now, contemporaneously almost with that transaction, Dean Richmond also, through his agent, Alonzo Richmond, put the lots on Michigan avenue north of the Richmond House into the market for sale, and they were sold, and that sale was made with the assent and knowledge of the firm of Richmond & Co.,—no express assent, but no dissent when they knew that the sale was being made; with their acquiescence, at least. Then at about that time, or shortly afterwards, Mr. Dean Richmond made disposition of the Racine lot, and also collected the mortgage due from the Racine Railroad Company.

There is no evidence in the record directly tending to show that the railroad stocks were sold,—that is, the Chicago & Milwaukee and the Chicago & Northwestern, or Chicago, St. Paul & Fond du Lac stock,—with the assent of Richmond & Co. The evidence seems to be that Dean Richmond himself sold the Chicago & Northwestern stock in New York through his brokers, H. T. Morgan & Co., and that Alonzo Richmond, as the agent of Dean Richmond, sold the Chicago & Milwaukee stock here in Chicago to one Frost. However, both those companies were corporations existing and having offices in this city. They had transfer books in this city. This was the home of Richmond & Co., and I think they are perhaps chargeable with notice of those transfers, although perhaps it is not material to lay any stress upon that consideration. From this time forward, however, Dean Richmond deals with this entire property as his own. He renders no accounts to Richmond & Co.; he does not charge them with interest; he makes no statement to them. There is no evidence in the correspondence or elsewhere that he from that time forward treated them in any way as his debtors. He takes possession of this property, pays the taxes, pays the assessments, pays the attorneys for perfecting the title, makes a donation of some part to a railroad that was proposed to be located through it; and in all respects treats the property, through his agent, Alonzo Richmond, who

resided here, as his absolute property, with no right on the part of Richmond & Co. to defeat his title. There can, then, it seems to me, be no ground for assuming but what the parties had acted upon the proposition contained in this letter of the 21st of September, 1861, and the principle seems to be established by all the well-considered cases, both in this state and in the federal courts, and elsewhere, that, on the question as to whether an absolute deed shall be considered a mortgage, you are not to look to what the parties say at the time they make the deed, but you are to look to the relation and the dealings between the parties before and after the deed was made, to determine whether the deed was intended as a security for money, or whether it was intended as an absolute conveyance; and if you are satisfied—if the court is satisfied from the evidence—that, although the deed was absolute upon its face, yet it was intended as a security for an indebtedness, they will treat it as an equitable mortgage, and if they are satisfied to the contrary they will, of course, treat the deed according to its terms. I can see no reason why the same rule cannot be carried further, and there are numerous cases, which I will not stop to quote, which have been cited by the defendants' counsel to show that it is competent for parties, where their dealings—their acts in pais—have been such as to raise a conclusive presumption against them that the transaction was a mortgage transaction, by subsequent dealings in pais to rebut the presumption, and show that a different transaction was subsequently agreed upon, or a different character subsequently given to the deed. I can see no reason why this rule is not sound; why, if parties have agreed to treat an absolute deed as a mortgage, they may not subsequently agree that the relations of debtor and creditor shall cease to exist between them, and the deed shall be from that time forward absolute, as it appears upon its face. The same evidence which is competent to raise the presumption in the mind of the court that the deed was a mortgage is competent to raise the presumption that the parties subsequently abandoned the relation of mortgagee and mortgagor. The authorities I will not stop to read, but they are ample, and sustain the doctrine, and it seems to me they are consonant with reason.

It is not necessary to say more, then, upon the conclusion to which I have arrived. But serious charges are made against the defendant in this case, or against Dean Richmond, in regard to the violation of the trust relation which existed between himself and Richmond & Co., in the sale of parts of the property; and I will simply say, in passing, that the evidence does not sustain the allegations in the bill in that regard. The evidence shows that $10,000, for instance, was all that Richmond & Co. were willing to give for the

Park Row house, and that was what Dean Richmond sold it for. The evidence is somewhat conflicting as to the value of the Michigan avenue property, but substantially, I think, it shows that Dean Richmond got all that piece of property was worth. The evidence as to the stocks, I think, fully shows that he got their full value at the time he sold them. The only question is as to whether he had a right to sell them at the time he did. Now, the letter of the 21st September says, "There are some things you never valued anything, or very little, such as the R. R. stocks, and perhaps Racine city bonds." This clearly alludes to these Chicago & Milwaukee and Chicago & St. Paul stocks, which Dean Richmond then had in possession. "Perhaps you would like to give those back to help us figure out with." The evidence shows that he did not give them back; he kept them in possession, and subsequently sold them; and I think they come fairly within the presumption that is raised in regard to the other property which he had in possession,—that they were the subject-matter of the settlement or adjustment between the parties; that he retained all the stocks and all the property he had in possession, except the Richmond House, and he gave that back, probably in place of the stocks, and he sold these stocks, as many other persons did sell them at the time, for all they were worth, —all the market would then justify. If the relationship of trustee still existed, why, of course, he had no right to sell any of this property without the assent of the other party; but if that relationship was at an end, as I conclude it was, then the sale was entirely justifiable, and the evidence shows that he got all it was worth, even if the relationship of trustee continued, although perhaps he would not have had a right to sell at all, as mortgagee, without notice to the other party. As I do not think that relationship continued, I shall not discuss it.

There is another feature in this case which strikes me as perhaps stamping the whole case somewhat with the characteristics of a speculative or fishing bill, and that is the allegation in regard to the purchase of the Rock Island and Galena stocks. The only evidence bearing upon that subject is that Thomas Richmond, some time in 1859, wrote to Dean Richmond that the Rock Island stock and Galena stock were going to rise; there was going to be a heavy crop, and the roads had a great deal to do, and the stocks would go up in value,—and suggested that Dean Richmond should buy some stocks and put up the margin, and as the stocks rose they would be able to withdraw the margin, and the stocks would carry themselves, and they would therefore make some money to help Richmond & Co. out of their embarrassments; and there is a letter in the record from W. T. Richmond to Thomas Richmond, in which he says that he saw Dean that day,

or the day before, and he said, "Tell your father I have bought the stocks." There is also evidence in the record that about that time Dean Richmond did buy 200 shares of Rock Island stock and 200 shares of Galena stock, and that in about three months afterwards he sold it at an advance, as I said before, of four or five cents on a dollar; but there is no evidence that that was the stock which he bought at the suggestion of Thomas Richmond, nor is there any evidence that he ever agreed to buy the stocks, or carry them. The allegation in the bill is that he carried the stocks until 1864, having bought them in 1859; that he would have made an immense profit out of it,—enough to have almost paid the indebtedness of Richmond & Co. But what sane business man would undertake to pay the indebtedness of a bankrupt firm to himself by gambling upon the stock market with his own money, for that is what the proposition amounts to; and the proposition in the complainant's bill in regard to that transaction is, I was going to say, kindred to many of the other propositions in the bill, in regard to other transactions, as, for instance, the grave assertion of a large equity in this case against the defendants because the Richmond House was sacrificed, or suffered to be sacrificed, for less than its value, when in point of fact the evidence discloses that, if it was sacrificed at all, it was sacrificed by the acquiescence of Thomas Richmond or Richmond & Co., they being the parties who held the title to it at the time of the foreclosure. Now, these parties must have known that the property was conveyed to Mr. Thomas Richmond. They must have been aware of the fact that, when this mortgage was foreclosed, Dean Richmond had not a scintilla of title in it, and yet that is set up here, because this deed never got upon the record. Dean Richmond is dead, and the inference seems to be that they could put the sacrifice of that property, of the Park Row property, and Michigan avenue property, and these stocks altogether, and make up an enormous charge of dereliction and bad faith, as trustee, as against Dean Richmond's estate.

It seems to me, for these considerations, that the allegations in the bill are not sustained by proof, and that the bill must be dismissed.

———

RICHMOND, The (SHIRLEY v.). See Case No. 12,795.

RICHMOND, The (WRITER v.). See Case No. 18,104.

RICHMOND, The DEAN. See Case No. 3,713.

RICHMOND CONSOLIDATED MIN. CO. (EUREKA CONSOLIDATED MIN. CO. v.). See Cases Nos. 4,548 and 4,549.

RICHMOND, FREDERICKSBURG & POTOMAC R. R. CO. (SAYLES v.). See Case No. 12,424.